## ISBERG *v.* MILLER.

REFORMATION OF INSTRUMENTS—MISTAKE—CONTRACTS—EQUITY—RESTRAINT OF TRADE.

A decree reforming a contract between complainant and defendant for the sale of defendant's grocery stock so as to include a provision against defendant engaging in the business for two years on a street mentioned, *held*, to be sustained by evidence of mutual mistake in drafting the instrument.

Appeal from Wayne; Hally, J. Submitted April 11, 1913. (Docket No. 47.) Decided September 30, 1913.

Bill by Samuel Isberg against Louis H. Miller and Julius Goldman for reformation of a written contract and other relief. From a decree for complainant, defendants appeal. Affirmed.

*Arthur E. Fixel* and *Max H. Finkelston,* for complainant.

*Edward Pokorny,* for defendants.

MOORE, J. Complainant filed his bill of complaint to reform a written contract which provided for the sale of real estate and contents of a grocery store.

The claim of the complainant is that Mr. Miller during the negotiations personally agreed to remain out of the business of keeping a grocery store for a period of two years between Thirtieth and Thirty-first streets on Michigan avenue, and that he now proposes to violate his agreement, and that this agreement was inadvertently left out of the written agreement. The plaintiff speaks and understands English very imperfectly.

The bill of complaint concludes as follows:

"(11) Your orator further shows that he will suffer great and irreparable loss and damage if said Louis H. Miller continues to conduct said business at 1465 Michigan avenue, and that said Louis H. Miller should be restrained from operating said business at 1465 Michigan avenue, from managing the same, or participating in its management, conduct, or ownership, directly or indirectly.

"(12) Your orator shows that the purchase price of the stock in trade and good will of the said Louis H. Miller's business at 1464 Michigan avenue involved a consideration of, to wit, seven thousand dollars, on which account moneys and property were paid to said Louis H. Miller by your orator, to the amount of, to wit, fifty-seven hundred dollars, and that the balance on said purchase price of seven thousand dollars is not yet due.

"Your orator is without remedy, except in a court of equity, and therefore prays:

"(1) That the said defendants, Louis H. Miller and Julius Goldman, make full, true, direct, and perfect answer to this your orator's bill of complaint.

"(2) That the said contract for the sale of the business of Louis Miller at 1464 Michigan avenue, under date of December 16, 1911, may be reformed so as to contain a provision prohibiting said Louis H. Miller from engaging in the grocery, crockery, or tinware business on Michigan avenue, between Thirtieth and

Thirty-first streets, in Detroit, Mich., for a period of two years from and after December 16, 1911.

"(3) That the court issue an injunction restraining said Louis H. Miller from participating in any manner in the management, conduct, or ownership of the business at 1465 Michigan avenue, Detroit, Mich. That said injunction likewise prohibit said Louis H. Miller from interfering in any manner with the free enjoyment of the good will of the business formerly conducted by him at 1464 Michigan avenue, Detroit, Mich., which business and the good will thereof were purchased by your orator.

"That your orator may have such and other relief as to the court may seem proper. That the court may award your orator such damage as it may be found on the hearing your orator sustained by reason of the wrongful conduct of said Louis H. Miller."

The negotiations covered a considerable period of time, and many papers were drawn in connection therewith, which were changed, interlined, and modified before a contract was finally signed. Each party employed a lawyer, and the lawyers had trouble in understanding and putting in shape the views of the parties.

There is much testimony to the effect that an agreement was made as stated in the bill of complaint, and that it was by mistake left out of the written contract. The attorney for Mr. Isberg swears positively to this, and says he dictated the agreement to his stenographer, and supposed it was put into the contract, and takes the blame for not discovering it was left out. His draft was afterwards submitted to the attorney for defendant. This attorney was not present at some of the interviews. He was sworn as a witness by the defendant. In his testimony appears the following:

"*Q.* You say that Mr. Isberg insisted that tinware and crockery be added to that paragraph?
"*A.* Yes.
"*Q.* Following that request or demand of Isberg,

did you follow that up by saying that this option should be put in there regarding the forfeiture?

"*A.* I don't know which preceded which. We discussed paragraph by paragraph, and frequently one or two of us gentlemen would leave the room, and the talking would continue just the same. I couldn't tell you in what order we took it up.

"*Q.* Now, Mr. Butzel, there was a great amount of talk back and forth, wasn't there, regarding this contract, before it was finally whipped into shape and signed?

"*A.* As to the details, yes; but the deal was going through earnestly desired by all parties. There never was a question about that. Sometimes, you know, you get into a deal, and you will find that something will fall short, something of that sort; but I don't think anybody had a notion that the deal was not going through. It was just a question of doing the fair thing in regard to the small details. Whenever Finkelston and I said, 'That is all right,' that that was the right thing, why, there was no kick on anybody's part, and he and I could usually agree without much trouble. In fact, I am fair to say that I protected Mr. Isberg on a few things as much as I did Miller, and I think Mr. Finkelston was equally fair in the matter.

"*Q.* Mr. Butzel, when this contract was finally prepared in the shape it is now in, will you say whether or not that included all of the agreements between the parties?

"*A.* That I couldn't say; it is all that I think of.

"*Q.* You think there is anything left out?

"*A.* I don't know; I don't know how much the original draft included, or what the talk was that preceded my first meeting there. * * *

"*Q.* With reference to that paragraph, the restriction clause, on the last page of Exhibit 3, it states there that Miller is to be prohibited from the use of his real estate between Thirtieth and Thirty-first streets on Michigan avenue. Do you recall any talk regarding the tenants Miller had in the store next to 1464, about the tenant possibly changing his business and going into the grocery business?

"*A.* I don't recall that; no. I know that Isberg was troubled; he was terribly afraid of competition;

he wanted to be very sure there would not be any grocery next to him, and insisted—he was very insistent on that point.

"*Q.* That there would not be a grocery store next to where he was, to what he was buying from Miller?

"*A.* Yes, sir; he realized it was quite a profitable undertaking that he had there.

"*Q.* Is that how that paragraph came to be in there?

"*A.* It was put in previously.

"*Q.* Put in previously?

"*A.* I think it was.

"*Q.* As modified in those two particulars?

"*A.* Yes.

"*Q.* I will ask you, Mr. Butzel, whether at any time while you were present in Finkelston's office, and Isberg and Mr. Miller were present, if you heard Isberg demand that Mr. Miller be personally prohibited from going into business?

"*A.* I don't think I did; I don't remember it.

"*Q.* Don't you think you would have heard it, if Isberg had personally demanded that Mr. Miller be prohibited from going into business himself?

"*A.* I would have heard it; whether I would remember it or not is another question.

"*Q.* Did—

"*A.* It might have happened when I was out of the room. I went out of the room to dictate to the stenographer several times. Once in a while they would get around me and talk so much that I went to the next room to take a little rest.

"*Q.* Did you submit that paragraph to Mr. Miller and explain what it meant, ask him for his approval?

"*A.* Well, that never was necessary. If I read anything to Miller, he was a very good, clear-headed, business man; he would understand it right off the bat. He had splendid command of every feature of the situation. He was a very satisfactory client. I felt constantly that I was sharing the responsibility. You had to explain the thing to Isberg four or five times, and then he wasn't sure he got it right; but Miller understood it right away, was a very good man to work for.

"*Q.* Well—

"*A.* Isberg couldn't get it through his cranium; Miller understood it right off.

"*Q.* Now, Mr. Butzel, can you recall the day the contract was signed?

"*A.* Well, I wasn't present when it was signed.

"*Q.* You were not present?

"*A.* No.     *     *     *

"*Q.* The only discussion you recall you had was regarding the addition of that clause of putting in of tinware and crockery part, and then the addition regarding the option?

"*A.* We all had a very strong impression—where it came from I don't know—that Miller simply was not going into business.

"*Q.* Was it discussed?

"*A.* No. Miller spoke of future plans and things of that sort, and the atmosphere seemed to be that he wasn't going to go into business; but he made no distinct promise. I don't know of any demand that was made on him at all.

"*Q.* Do you remember any distinct promises?

"*A.* No, no.

"*Q.* That is all."

Cross-examination, by Mr. Fixel:

"*Q.* Then there was a kind of general tone or understanding there that Miller was not going back in business for a while, at any rate?

"*A.* I had that general impression.

"*Q.* Did you gather that from the conversation that was had generally among these people?

*A.* No, more from Mr. Miller's own conduct, his own attitude, than any particular thing. I didn't think they seemed to insist on it. It seemed to be Miller's intention. I don't think the matter came up.

"*Q.* You were absent from a great many of the meetings, weren't you, or from some of them, but you heard about that later on?

"*A.* I was absent from all meetings previous to the first time, when I was called in. There had already been prepared a contract, at least, the one I mention.

"*Q.* You had a copy of it at your office?

"*A.* That was brought to me by Miller. That is before I made any appearance. What took place be-

fore that time I don't know. I didn't ask Miller. He handed me this.

"*Q.* It was a carbon copy of it?

"*A.* Yes. Then I went there several times, and the parties were assembled before I came. I knew about how tardy they were coming over there. Miller was usually fairly prompt. I always said, 'Let me know when they are there.' When I came over they were assembled; they were all there, were all pretty busy talking things over.

"*Q.* You never were out at the store, No. 1464?

"*A.* Never. I don't know where it is.   *   *   *

"*The Court:* Mr. Butzel, now that this is somewhat fresh in your mind, can you remember any remark, can you remember what was said, about this man not personally engaging in business for two years?

"*A.* I don't think that was said in my presence.

"*The Court:* Was it said to you by anybody?

"*A.* By anybody? I don't think there was any such promise given while I was around. As I say, the only thing was that Miller had quite a number of pleasant plans and so forth; the atmosphere was created that he was leaving the business, that he was tired out and wanted to get out of business, and so forth. I do not think the necessity of binding him to that entered anybody's head. Possibly a provision of that kind, a provision of that sort, might have been made by him before I ever came in or before they had the paper drawn; but while we were there that idea was there, simply taking it for granted—I don't think there was any reference to it.

"*Q.* That is, in your presence, as far as you know?

"*A.* In my presence, as far as I know.

"*Q.* That is all."

The case was tried in open court. The testimony was very voluminous. The record contains upwards of 350 pages. At its conclusion the trial judge who saw the witnesses said:

"I find that it was expressly understood between Samuel Isberg and Louis H. Miller that the defendant was not to engage in a similar business on Michigan avenue, between the streets named, for a period of

two years, and that by an inadvertence this clause and proviso was omitted from the written instrument which was drawn to express the will of the parties.

"Not only was this mistake made in drawing the contract, but the defendant, by his conversation with others, and by his conduct in opening the new store, for a considerable time believed the bargain he had made restricted him. He subsequently learned of its omission, and gave as his excuse the omission of the restriction from the written instrument. This is, in my judgment, sufficient to establish the two essentials to give equity jurisdiction, to wit, the making of a mistake, and both parties, at least for a time, admitting that a mistake had been made; the defendant's admission being clear to me from his conduct, and the testimony produced.

"The contract will be reformed in accordance with the prayer of the complainant, who is entitled to the relief prayed for, except as herein otherwise specified.

"Some testimony was offered as to the damages sustained. This testimony was not entirely satisfactory. A court of equity is not an advantageous place to present such an issue, and, considering the time which has elapsed since the case was submitted, I cannot see how full justice could be done to the parties in this proceeding. This issue should be presented to the law side of the court. Complainant will have costs and a decree in accordance herewith."

We have stated some of the testimony. It would profit no one to quote fully the details of the testimony. A careful reading of it satisfies us that the conclusion reached by the trial judge was correct.

The decree is affirmed, with costs.

STEERE, C. J., and MCALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.